Nos. 15-1465 & 15-1468

# In the United States Court of Appeals for the Sixth Circuit

———————————————

SeTara Tyson,
*Plaintiff-Appellee-Cross-Appellant,*

v.

Sterling Rental, Inc., dba Car Source
*Defendant-Appellant-Cross-Appellee*

and

Al Chami and Rami Kamil,
*Defendants-Appellants-Cross-Appellees.*

———————————————

On Appeal from the United States District
Court for the Eastern District of Michigan

———————————————

## FIRST BRIEF OF APPELLEE/CROSS-APPELLANT

———————————————

Ian B. Lyngklip
Lyngklip & Associates
24500 Northwestern Hwy, Suite 206
Southfield, MI 48075
(248) 208-8864

Deepak Gupta
Matthew W.H. Wessler
Richard J. Rubin
Gupta Wessler PLLC
1735 20th Street, NW
Washington, DC 20009
(202) 888-1741

*Counsel for the Appellee/Cross-Appellant*

September 18, 2015

# TABLE OF CONTENTS

Table of authorities ................................................................................ ii

Jurisdictional statement ........................................................................ 3

Statement of the issues ......................................................................... 4

Statement of the case ........................................................................... 5

Summary of argument ......................................................................... 24

Standard of review .............................................................................. 26

Argument ............................................................................................ 26

    I.    The district court correctly determined that Car Source violated
the Equal Credit Opportunity Act. ....................................... 26

    II.    Michigan's economic-loss doctrine does not bar Ms. Tyson's
statutory conversion claim. ................................................... 35

          A.    Section 600.2919a(2) unambiguously permits statutory
conversion claims to proceed alongside *all* other claims. ........... 36

          B.    Section 600.2919a overrides the common-law economic-
loss doctrine ......................................................... 37

          C.    The Michigan Supreme Court's intervening decision in
*Aroma Wines* confirms that statutory conversion claims can
coexist with breach-of-contract claims. ...................... 39

Conclusion .......................................................................................... 42

Statement in support of oral argument ............................................... 44

Certificate of compliance .................................................................... 44

Designation of relevant district court documents ................................ 45

Certificate of service .......................................................................... 47

# TABLE OF AUTHORITIES

## Cases

*Aroma Wines & Equipment, Inc. v. Columbian Distribution Services, Inc.*,
    497 Mich. 337, 2015 WL 3772434 (Mich. June 17, 2015) ..........................*passim*

*Bayard v. Behlmann Auto Services*,
    292 F. Supp. 2d 1181 (E.D. Mo. 2003) .............................................................. 34

*Cleveland Indians Baseball Co., L.P. v. New Hampshire Insurance Co.*,
    727 F.3d 633 (6th Cir. 2013) ............................................................................... 38

*Davis v. U.S. Bancorp.*,
    383 F.3d 761 (8th Cir. 2004) ............................................................................... 17

*Department of Agriculture v. Appletree Marketing, LLC*,
    779 N.W. 2d 237 (Mich. 2010)................................................................ 20, 36, 37

*Fischl v. General Motors Acceptance Corp.*,
    708 F.2d 143 (5th Cir. 1983). ............................................................... 17, 18, 31

*In re Receivership*, 821 N.E. 2d 503 (Mich. 2012) ......................................... 38

*In re Saturn L-Series Timing Chain Products Liability Litigation*,
    2008 WL 4866604 (D. Neb. Nov. 7, 2008) ....................................................... 39

*Kailin v. Armstrong*, 643 N.W. 2d 132 (Wis. App. 2002).............................. 39

*Lewis v. ACB Business Services, Inc.*,
    135 F.3d 389 (6th Cir. 1998) .............................................................................. 30

*Mays v. Buckeye Rural Electricity Co-op, Inc.*,
    277 F.3d 873 (6th Cir. 2002) .............................................................................. 31

*Neibarger v. Universal Cooperatives, Inc.*,
    486 N.W. 2d 612 (Mich. 1992)........................................................................... 39

*Orrand v. Scassa Asphalt, Inc.*,
    794 F.3d 556 (6th Cir. 2015) .............................................................................. 26

*Pulver v. Dundee Cement Co.*,
    515 N.W.2d 728 (1994) ................................................................................ 25, 38

*Ramirez v. Greenpoint Mortgage Funding, Inc.*,
    268 F.R.D. 627 (N.D. Cal. 2010) ...................................................................... 34

*Schlegel v. Wells Fargo Bank, N.A.*,
　720 F.3d 1204 (9th Cir. 2013) ................................................................ 28

*TransAmerica Assurance Corp. v. Settlement Capital Corp.*,
　489 F.3d 256 (6th Cir. 2007) .................................................................. 26

*Treadway v. Gateway Chevrolet Oldsmobile Inc.*,
　362 F.3d 971 (7th Cir. 2004) .................................................... 27, 29, 31

*United States v. Stewart*,
　628 F.3d 246 (6th Cir. 2010) .................................................................. 32

## Legislative and Regulatory Materials

12 C.F.R. § 1002.16(b)(4) ............................................................................ 34

12 C.F.R. § 202, App. C .............................................................................. 29

12 C.F.R. § 202.9(b)(2) ............................................................................... 18

15 U.S.C. § 1691 ......................................................................................... 20

15 U.S.C. § 1691(d)(1) ................................................................................ 17

15 U.S.C. § 1691(d)(2) ........................................................................ *passim*

15 U.S.C. § 1691(d)(2)(3) ........................................................................... 22

15 U.S.C. § 1691(d)(3) ......................................................................... 18, 29

15 U.S.C. § 1691(d)(6) ........................................................................ *passim*

15 U.S.C. § 1691a(e) ................................................................................... 17

15 U.S.C. § 1691e(b) ............................................................................ 18, 30

15 U.S.C. § 1691e(c) ............................................................................ 18, 34

28 U.S.C. § 1291 ........................................................................................... 3

28 U.S.C. § 1331 ........................................................................................... 3

Mich. Comp. Laws § 440.9620 cmt. 12 ..................................................... 38

Mich. Comp. Laws § 440.9626 cmt. 2 ....................................................... 38

Mich. Comp. Laws § 600.2919a ......................................................... *passim*

Mich. Comp. Laws § 600.2919a(1) ................................................. 19, 20, 35

Mich. Comp. Laws. § 600.2919a(1)(a) ..................................................... 4, 19, 25, 41

Mich. Comp. Laws § 600.2919a(2) ...................................................................*passim*

Pub. L. 93-495, § 502, 88 Stat. 1521 (Oct. 28, 1974) ............................................ 17

*Public Roundtables: Protecting Consumers in the Sale and Leasing of Motor Vehicles*, 76 Fed. Reg. 50 (March 15, 2011) ......................................................................... 14

S. Rep. No. 94-589 (1976) ............................................................................ 18, 31

**Miscellaneous**

Angie Schmitt, *The American cities with the most growth in car-free households*, Greater Greater Washington, January 21, 2014 .................................................. 15

Comments of the Attorneys General of 30 States, *The FTC's Increased Role in Regulating Auto Advertising, Sales and Lease Practices* ..................................... 13

Delvin Davis, Center for Responsible Lending, *Deal or No Deal: How Yo-Yo Scams Rig the Game Against Car Buyers* 3 (2012) ....................................... 14

*Detroit's an Expensive City for Car Ownership*, WOOD News, Sept. 12, 2014 ............. 16

Federal Highway Administration, *Mobility Challenges for Households in Poverty* (2014) ....................................................................................................... 16

Ken Bensinger, *Affordable cars are key to getting off public aid, study finds*, LA Times, March 14, 2012 .................................................................................. 15

Rolf Pendall et al., Urban Institute, *Driving to Opportunity* (2014) ........................... 14

Ryan Felton, *How Detroit ended up with the worst public transit*, Detroit Metro Times, March 11, 2014 ................................................................................. 15

Vincent A. Wellman, *Assessing the Economic Loss Doctrine in Michigan: Making Sense Out of the Development of Law*, 54 Wayne L. Rev. 791 (2008) ........................ 36

# INTRODUCTION

SeTara Tyson visited a used-car dealership and, based on her paystubs and bank statements, the dealership told her that she was "approved for financing." It set the terms, took her down payment, and gave her a receipt. Ms. Tyson drove off in her first car. But the sale was made without the finance company's approval—a practice known as a "spot delivery" or, less euphemistically, a "yo-yo scam."

The dealership then called Ms. Tyson back in, telling her that her car might unexpectedly "shut off" without a new GPS unit. When she arrived, the dealership took the keys, spirited the car away, and demanded her contract—claiming it needed to "correct the payment amount." She was told that "the deal had fallen through" and, if she wanted her car back, she had to "bring back the contract and $1,500." With Ms. Tyson's mother, little brother and infant daughter looking on, a porter dumped her personal belongings at her feet. He told the dealership staff that he had "looked all through [the] car," and the "contract was not in there." Ms. Tyson received her key chain—minus the key to her new car. Car Source never returned Ms. Tyson's down payment.

The district court correctly concluded that the dealership's conduct violated the Equal Credit Opportunity Act, which prohibits a creditor from denying or revoking credit, or changing the terms of a credit arrangement, absent a statement of reasons. Indeed, the dealership admits that it *never* provides the required notice.

But the dealership's conduct caused far more harm than a lack of a notice. It also deprived Ms. Tyson of the use of her car, throwing her life into disarray. She had to rely on public transportation to shuttle between her responsibilities as a single mother and her minimum-wage job. Hundreds of dollars were withdrawn from her bank account, triggering overdraft fees. And the state cut benefits because she received a grant to help with the purchase but had no car to show for it.

The district court, invoking the *common-law* economic-loss doctrine, concluded that Michigan law barred Ms. Tyson from seeking compensation for these harms through a *statutory* conversion claim because "the underlying transaction is governed by a contract." Just four months later, however, the Michigan Supreme Court made clear that the statutory conversion claim must "work alongside" all other "available" remedies. *Aroma Wines & Equip., Inc. v. Columbian Distr. Servs., Inc.*, 497 Mich. 337, 2015 WL 3772434 (Mich. June 17, 2015). The district court, lacking the benefit of that decision, incorrectly predicted state law. As *Aroma Wines* makes clear, the Legislature's express decision to allow statutory conversion claims "in addition to" any other right or remedy—contract claims included—leaves no room for common-law rules like the economic-loss doctrine. The statute's language, along with the black-letter rule that the common law cannot override statutory text, compels reversal on the statutory conversion claim.

## JURISDICTIONAL STATEMENT

The district court had subject-matter jurisdiction under 28 U.S.C. § 1331. On March 18, 2015, the court granted partial summary judgment for Ms. Tyson on her federal ECOA claim and state-law claims under the Motor Vehicle Sales Finance Act and Michigan Credit Reporting Act.[1] On January 20, 2015, the court also granted summary judgment for Car Source on the conversion claims, and denied summary judgment as to all other claims.[2] The court then denied both Ms. Tyson's and Car Source's motions for reconsideration on February 11, 2015 and March 31, 2015, respectively.[3]

Because these orders did not finally resolve the case, the parties agreed to resolve all remaining claims by stipulation.[4] Accordingly, on April 9, 2015, the district court entered an order finally "resolving the remaining claims" in the case.[5] Car Source timely appealed on April 17, 2015.[6] Ms. Tyson timely appealed on April 23, 2015.[7] This Court has jurisdiction under 28 U.S.C. § 1291.

---

[1] Order Granting Plaintiff's Motion for Partial Summary Judgment, R. 55, Page ID #945.

[2] Order on Motion for Summary Judgment, R. 43, Page ID #587.

[3] Order on Motion for Reconsideration, R. 48, Page ID #767; Order Denying Motion for Reconsideration, R. 58, Page ID #973.

[4] Stipulation and Order, R. 59, Page ID #975-76.

[5] *Id.*

[6] Notice of Appeal, R. 60, Page ID #977.

[7] Notice of Cross Appeal, R. 62, Page ID #980.

## STATEMENT OF THE ISSUES

**1. *Equal Credit Opportunity Act*.** The Equal Credit Opportunity Act (ECOA) prohibits a creditor from "den[ying]" or "revo[king]" credit or "chang[ing]" the "terms of an existing credit arrangement" without providing the consumer with a "statement of reasons for such action." 15 U.S.C. §§ 1691(d)(6), (d)(2). Car Source, a car dealer that controlled the "entire[]" credit offer, "revoked" the plaintiff's "offer of credit after attempting to change the terms of an existing credit arrangement."[8] Car Source freely "admits" that it "never" provides the notices required by ECOA and that it "did not do so" here.[9] Did the district court correctly determine that Car Source violated ECOA? And, if so, did the district court err in denying Ms. Tyson injunctive relief under ECOA?

**2. *Statutory Conversion*.** Michigan law creates a statutory cause for action for a person "damaged as a result of" another person's "stealing or embezzling property or converting property to [that] person's own use." Mich. Comp. Laws. § 600.2919a(1)(a). The "remedy provided by this section is in addition to any other right or remedy the person may have at law or otherwise." *Id.* § 600.2919a(2). Did the district court err when it held that Michigan's *common-law* economic-loss doctrine barred the plaintiff's claim for *statutory* conversion?

---

[8] Opinion and Order Granting Plaintiff's Motion for Partial Summary Judgment, D. 55, Page ID #940.

[9] *Id.*

## STATEMENT OF THE CASE

### A. Factual Background

*1. SeTara Tyson buys a car from Car Source.* By the summer of 2013, SeTara Tyson was ready to become a first-time car owner.[10] Ms. Tyson, a single mother in Detroit, was constantly "worr[ied]" about "being late" while juggling her $7.40-an-hour minimum-wage job at McDonald's with her infant daughter's care.[11] So she visited Car Source to find out about her options.[12] Having recently qualified for a state grant to assist with the purchase, she brought a check for the down payment, "copies of her two most recent pay stubs," showing that she grossed "about $1,000 per month," and copies of her most recent "bank statements from Bank of America."[13] Car Source processed the information provided by Ms. Tyson into its computer system, which calculated her income based on her the length of time she had worked and the amount of pay.[14]

Based on this information, and its own calculation of Ms. Tyson's annual income,[15] the dealership told Ms. Tyson that she "had been approved for

---

[10] Deposition of SeTara Tyson, R. 41-7, Page ID #461.

[11] Deposition of SeTara Tyson, R. 33-3, Page ID #331; Deposition of SeTara Tyson, R. 41-7, Page ID #456.

[12] Declaration of SeTara Tyson, R. 41-2, Page ID #419.

[13] *Id.*

[14] Deposition of Rami Kamil, R. 44-2, Page ID #642-6.

[15] Because of Mr. Kamil's error, the computer system assumed a shorter employment period than Ms. Tyson actually worked and hence, the computer

financing" and gave her the choice of purchasing one of six cars on the lot.[16] Ms. Tyson chose a 2006 Chevrolet Cobalt.[17]

Rami Kamil, Car Source's manager, prepared the paperwork. He "typed up [Ms. Tyson's] contract,"[18] which included a credit application and a retail-installment contract.[19] Using her paystubs and bank-account information, he "set every material term of [the] financing agreements, including the down payment owed, the interest rate or APR, and the monthly payment owed."[20] On the retail-installment contract, Mr. Kamil identified Car Source as the "Creditor-Seller."[21]

Once Car Source set the terms, Ms. Tyson delivered her down-payment check and $48 cash to Mr. Kamil.[22] Car Source handed her the keys and a receipt.[23] The sale was complete, and Ms. Tyson drove off the lot in her newly-purchased car.[24] All told, Car Source required Ms. Tyson to make a $1,200 down

---

system's calculations reflected a higher-than-actual income figure that was never provided by Ms. Tyson herself.

[16] *Id.*, Page ID #420.

[17] *Id.*

[18] Deposition of Rami Kamil, R. 44-2, Page ID #624

[19] *See* Credit Application, R. 44-3, Page ID #714, and Retail-Installment Contract, R. 41-9, Page ID #493

[20] Order Granting Plaintiff's Motion for Partial Summary Judgment, Page ID #938.

[21] Retail-Installment Contract, R. 41-9, Page ID #493.

[22] Complaint, R. 32, Page ID #275.

[23] Declaration of SeTara Tyson, R. 41-2, Page ID #420.

[24] *Id.*

payment, pay $48 in licensing fees, and agree to make 45 monthly payments of $326.49, which included the maximum-allowable compounded interest rate of 24.49%.[25] For a used car with a sticker price of $8,525, Ms. Tyson would ultimately owe $15,490.05.[26] Her purchase, though costly, meant that she "didn't have to worry" about relying on public transportation to meet the competing demands of her job and her young daughter's care.[27]

**2. *Car Source's finance company rejects the deal.*** When Car Source sold Ms. Tyson her Cobalt, it told her that she had been approved for financing.[28] It did not wait for its finance company, Credit Acceptance Corporation, to accept assignment of the contract; instead it handed Ms. Tyson the keys and told her that the car was hers.[29] Shortly after Ms. Tyson left the lot, however, Credit Acceptance informed Car Source that it would not "fund the deal."[30] This left Car Source with a choice. Honoring the original deal promised to Ms. Tyson meant Credit Acceptance would not "pay [Car Source] for the contract" and would instead act only "as a billing service" for Car Source, accepting monthly payments from Ms.

---

[25] Retail-Installment Contract, R. 41-9, Page ID #493-494.

[26] *Id.*

[27] Deposition of SeTara Tyson, R. 33-3, Page ID #338.

[28] Deposition of Rami Kamil, R. 44-2, Page ID #650.

[29] *Id.*; *Id.*, Page ID #675.

[30] *Id.*, Page ID #652.

Tyson and passing them along to the dealer.[31] If Car Source wanted Credit Acceptance to accept the contract and pay it for the sale, it would need to "cancel [the original] deal," and renegotiate with the buyer.[32]

### 3. Car Source calls Ms. Tyson back to the dealership. Two days after Ms. Tyson purchased her car, Car Source chose the latter course and called Ms. Tyson back in. On the phone, a Car Source employee, Al Chami, told Ms. Tyson that she needed a "new GPS unit installed in the car" and that the car could "shut off," leaving her stranded and in need of a tow.[33] He also suggested that the bank could offer her a lower monthly rate—dropping her payments by more than a hundred dollars.[34] Although Ms. Tyson had appointments that day, she didn't want to risk the possibility that her car would die. So she returned to Car Source "just to see [if] everything was correct."[35] Ms. Tyson's mother, little brother, and daughter accompanied her.[36]

---

[31] *Id.*

[32] Deposition of Jon Lun, R. 41-10, Page ID #512; Deposition of Rami Kamil, R. 44-2, Page ID #681.

[33] Declaration of SeTara Tyson, R. 41-2, Page ID #420; Deposition of SeTara Tyson, R. 41-7, Page ID #439.

[34] Deposition of SeTara Tyson, R. 41-7, Page ID #439; Declaration of SeTara Tyson, R. 41-2, Page ID #420.

[35] Deposition of SeTara Tyson, R. 41-7, Page ID #439.

[36] Declaration of SeTara Tyson, R. 41-2, Page ID #420

At the dealership, Ms. Tyson parked by the showroom and went inside.[37] A Car Source employee asked for the keys and then took the car to a service bay to "install the new GPS unit."[38] Once the car was gone, Mr. Chami told Ms. Tyson to hand over the original contract to "correct the payment amount."[39] Ms. Tyson explained that she "did not bring the contract" because no one had "asked [her] to."[40] This response angered Mr. Chami, who, in the presence of Ms. Tyson's young daughter and brother, began "yelling and swearing" at the family.[41]

**4. *Car Source takes Ms. Tyson's car away*.** Ms. Tyson demanded an explanation. Mr. Chami told Ms. Tyson that "the deal had fallen through."[42] If she wanted her car back now, he explained, she had to "bring back the contract and $1,500."[43] Ms. Tyson didn't have the money, and, though her mother offered to pay it, doing that "might mean we couldn't pay our house payment."[44]

Before long, a porter entered the showroom and "dumped" Ms. Tyson's belongings—which had been in the car—"at her feet."[45] It looked to Ms. Tyson

---

[37] *Id.*

[38] *Id.*

[39] *Id.*

[40] *Id.*

[41] *Id.*; Declaration of Leslie Tyson, R. 41-3, Page ID #424.

[42] Complaint, R. 32, Page ID #276.

[43] Declaration of SeTara Tyson, R. 41-2, Page ID #421.

[44] *Id.*

[45] Declaration of Leslie Tyson, R. 41-3, Page ID #424.

like someone had rifled through her things, including her baby's diaper bag, and she heard the porter report that he had "looked all through [the] car," and the "contract was not in there."[46] Ms. Tyson's key-chain was returned to her—minus the key to the Cobalt.[47] Without a car, Ms. Tyson was in "tears" and her family was stuck. They had no "extra money" for "cab fare,"[48] and the presence of two small children and a car seat made walking impossible. At last, the porter "volunteered" to drive them home.[49]

**5. *The taking of Ms. Tyson's car harms her in multiple ways*.** As a young woman with a small child, Ms. Tyson felt "bullied" by the dealership.[50] She had reached a deal with Car Source, only to now realize that they hadn't "h[e]ld up their end of the bargain."[51] With no car, she was now "back at square one," unable to get rides when she needed them.[52] Her life became "stressful" and "frustrating."[53] Taking the bus required waking up "extra, extra early" and meant waiting, sometimes for "hours at a time."[54] She had to "reschedule appointments,"

---

[46] Declaration of SeTara Tyson, R. 41-2, Page ID #421.

[47] Complaint, R. 32, Page ID #276.

[48] Deposition of SeTara Tyson, R. 41-7, Page ID #444.

[49] *Id.*; Declaration of SeTara Tyson, R. 41-2, Page ID #421.

[50] Deposition of SeTara Tyson, R. 41-7, Page ID #445.

[51] *Id.*, Page ID #454.

[52] *Id.*, Page ID #448, 456.

[53] *Id.*, Page ID #456.

[54] *Id.*, Page ID #456-457.

and traveling with a five-month old "in the wintertime" was going to be difficult.[55]
She wanted her car back.[56]

Ms. Tyson's difficulties did not end there. Several weeks later—still with no car—Ms. Tyson checked her bank account only to see that Credit Acceptance had taken out $326.00.[57] This withdrawal triggered an overdraft fee, which Ms. Tyson paid even though it left her without any money until her next paycheck.[58] Car Source's repossession also meant that Ms. Tyson "couldn't show proof that [she] had the car in [her] possession"—a condition of her down-payment grant—which led the state to cut off her benefits.[59] As a result, she lost access to state-provided "bus tickets," which she needed "to get back and forth to work."[60] And the state likewise terminated Ms. Tyson's cash benefits and health insurance.[61]

### 6. *Car Source claims that Ms. Tyson lied about her income.* Car
Source later tried to justify its conduct by claiming that Ms. Tyson had lied about her income to purchase the car. But, when she visited Car Source, Ms. Tyson had

---

[55] *Id.*, Page ID #456.

[56] *Id.*, Page ID #463. One week after Car Source was sued, it sent Ms. Tyson an unsolicited letter demanding that she "remove[]" the "unattended" car from the premises. Letter to SeTara Tyson, R. 33-4, Page ID #341. The dealership gave her seven days to comply, at which point it would begin to impose "a daily storage fee." *Id.*

[57] Declaration of SeTara Tyson, R. 41-2, Page ID #421.

[58] *Id.*

[59] Deposition of SeTara Tyson, R. 41-7, Page ID #446.

[60] *Id.*, Page ID #447.

[61] *Id.*, Page ID #449.

brought "copies of her two most recent pay stubs" and copies of her most recent "bank statements from Bank of America,"[62]—a fact Car Source itself confirmed.[63] Ms. Tyson's paystubs showed that she grossed "about $1,000 per month."[64] And the credit processing system that Car Source used to process her deal required Car Source to "fill in all the information off of the pay stub" to calculate her terms.[65] When Car Source passed its contract on to Credit Acceptance, it also included "Ms. Tyson's pay stubs to prove her income" and did not (and does not) dispute the accuracy of this information.[66] As Credit Acceptance explained, any discrepancy between Ms. Tyson's documentation of her income and Car Source's documentation is because Car Source either "chose the wrong way" to complete the credit application or "entered [the information] incorrectly."[67]

A sign displayed prominently on Car Source's front window suggests that Ms. Tyson was not the first customer whose car had been reclaimed in this manner. Any "fraudulent" documents or paystubs, or any information later deemed "misleading," the sign warns, will "result in the complete loss of [] down

---

[62] Declaration of SeTara Tyson, R. 41-2, Page ID #419

[63] *See* Deposition of Rami Kamil, R. 44-2, Page ID  #640.

[64] Declaration of SeTara Tyson, R. 41-2, Page ID #419.

[65] Deposition of Jon Lun, R. 41-10, Page ID #505.

[66] *Id.*, Page ID #504.

[67] *Id.*, Page ID #510.

payment" to Car Source.[68] Car Source never returned Ms. Tyson's down payment.

**7. "Spot delivery" or "yo-yo" arrangements harm competitors and consumers.** Law enforcement, consumer advocates, and industry groups alike have long criticized the car-dealer practices illustrated by this case. "Spot delivery" or "yo-yo" schemes are those in which a dealer sells a car to a consumer before the dealer obtains acceptance from the finance company; the consumer is then called back into the dealership and told that the deal cannot be made as agreed. Such arrangements are "manifestly contrary to" and "violate" Michigan's Motor Vehicle Sales Finance Act, according to the relevant state agencies.[69] The Michigan Automobile Dealers Association agrees. It notified dealerships statewide that "spot delivery" arrangements are likely to "generate[] insecurity" for the dealer and "induce the dealer to void or accelerate the Contract."[70] The industry group told its members that this practice "is clearly in violation" of the MVSFA.[71] At least a dozen other states have passed laws specifically banning the practice, observing along the way that "it is difficult to find a more abusive practice in the

---

[68] Car Source Sign, R. 41-12, Page ID #534.

[69] Bulletin of State of Michigan Department of Insurance and Financial Services, R. 41-17, Page ID #563; Letter from Deputy Commissioner of Michigan Financial Institutions' Bureau Murray Brown, R. 41-13, Page ID #535.

[70] Dealer Advisory, R. 41-18, Page ID #565.

[71] *Id.*

context of auto sale and financing."[72] And the Federal Trade Commission, too, has recently requested comment and held roundtables to determine how best to protect consumers from this abusive practice.[73]

One reason that "spot delivery" and "yo-yo" tactics have been discouraged is that they "distort[] the marketplace and hurt[] competitors almost as much as [they] hurt consumers."[74] A dealership that uses such agreements can "remove the consumer from the marketplace" and prevent further shopping or price comparison at competitor dealers, even if a deal isn't completely in place.[75] The result is a less-informed consumer and an artificially inflated car price.[76]

Another reason to discourage spot delivery is that it stands in the way of car ownership—a key factor for upward economic and social mobility. Apart from

---

[72] *See* Comments of the Attorneys General of 30 States, *The FTC's Increased Role in Regulating Auto Advertising, Sales and Lease Practices* 3, https://www.ftc.gov/sites/default/files/documents/public_comments/public-roundtables-protecting-consumers-sale-and-leasing-motor-vehicles-project-no.p104811-00112/00112-82927.pdf (identifying state laws that prohibit "spot delivery" practices).

[73] *See Public Roundtables: Protecting Consumers in the Sale and Leasing of Motor Vehicles*, 76 Fed. Reg. 50 (March 15, 2011)

[74] Comments of the Attorneys General of 30 States, at 4.

[75] Delvin Davis, Ctr. for Responsible Lending, *Deal or No Deal: How Yo-Yo Scams Rig the Game Against Car Buyers* 3 (2012), http://www.responsiblelending.org/other-consumer-loans/auto-financing/research-analysis/Deal-or-No-Deal-How-Yo-Yo-Scams-Rig-the-Game.pdf.

[76] *Id.*

their homes, cars are "the most expensive purchase" most consumers make.[77] Access to a private car is also "positively associated with employment outcomes for low-income and minority adults."[78] In one recent study, 82% of low-income families who purchased a car with help from a Ways to Work loan (the country's largest low-income car ownership program) "were able to get off welfare and other public aid as a result."[79] Other research confirms the basic point: access to a reliable car "plays an important role in shaping . . . economic outcomes of low-income households."[80] And car ownership is "particularly important for low-income women," who "often juggle paid work with household-serving responsibilities."[81]

Yet in Detroit, where Ms. Tyson works and lives, many families don't own a car. By some estimates, roughly 60,000 households in metro Detroit (80% of whom

---

[77] Comments of the Attorneys General of 30 States, at 10.

[78] Rolf Pendall et al., Urban Institute, *Driving to Opportunity* 3 (2014), http://www.urban.org/sites/default/files/alfresco/publication-pdfs/413078-Driving-to-Opportunity-Understanding-the-Links-among-Transportation-Access-Residential-Outcomes-and-Economic-Opportunity-for-Housing-Voucher-Recipients.PDF.

[79] Ken Bensinger, *Affordable cars are key to getting off public aid, study finds*, LA Times, March 14, 2012, http://articles.latimes.com/2012/mar/14/business/la-fi-car-ownership-20120314.

[80] Pendall, at 1.

[81] *Id.* at 3.

are black) have no access to a car.[82] Though long known as the "car capital of the world," over the last decade Detroit has outpaced every other city—by a wide margin—in the increase in households that own no car.[83] And first-time car buyers face a high barrier to ownership: Detroit has the most expensive car-insurance rates in the country. Owners pay 165% more than the national average—a massive rate compared with even the second-most expensive city, New York, which is "merely" 36% higher than the national average.[84] In 2001, fully 20% of low-income families didn't own cars—a number that has only increased since then.[85]

## B.    Statutory Background

### 1.    The Equal Credit Opportunity Act

Congress passed ECOA to ensure that "financial institutions" and "other firms engaged in the extensions of credit exercise their responsibility to make credit available with fairness, impartiality, and without discrimination." Pub. L. 93-495,

---

[82] Ryan Felton, *How Detroit ended up with the worst public transit*, Detroit Metro Times, March 11, 2014, http://www.metrotimes.com/detroit/how-detroit-ended-up-with-the-worst-public-transit/Content?oid=2143889.

[83] Angie Schmitt, *The American cities with the most growth in car-free households*, Greater Greater Washington, January 21, 2014, http://greatergreaterwashington.org/post/21444/the-american-cities-with-the-most-growth-in-car-free-households/.

[84] *Detroit's an Expensive City for Car Ownership*, WOOD News, Sept. 12, 2014, http://www.woodradio.com/articles/wood-news-125494/detroits-an-expensive-city-for-car-12758218/.

[85] *See* Federal Highway Administration, *Mobility Challenges for Households in Poverty* 2 (2014), http://nhts.ornl.gov/briefs/PovertyBrief.pdf.

§ 502, 88 Stat. 1521 (Oct. 28, 1974). Under ECOA, a "creditor" is any person "who regularly extends, renews, or continues credit; any person who regularly arranges for the extension, renewal, or continuation of credit; or any assignee of an original creditor who participates in the decision to extend, renew, or continue credit." 15 U.S.C. § 1691a(e). This definition is expansive, and includes not only the ultimate creditor but also entities that assist with the procuring of credit. *Id.*

ECOA's "twin goals" are "consumer protection and education." *Fischl v. Gen'l Motors Acceptance Corp.*, 708 F.2d 143, 146 (5th Cir. 1983). To this end, ECOA, as amended, "establishes procedural requirements for extending credit and communicating with applicants." *Davis v. U.S. Bancorp.*, 383 F.3d 761, 766 (8th Cir. 2004). One key procedural requirement is "that of notice." *Id.* ECOA creates a "strict" two-step notice framework that creditors must follow when handling consumer credit applications. *Fischl*, 708 F.2d at 146. First, when a consumer applies for credit, § 1691(d)(1) requires that, "[w]ithin thirty days [] after receipt of a completed application for credit," a creditor "shall notify the applicant of its action on the application." Second, under § 1691(d)(2), "[e]ach applicant against whom adverse action is taken shall be entitled to a statement of reasons for such action from the creditor."

ECOA's "adverse action" notice requirement is "one of [the] most important provisions" in the statute and a "first" in federal legislation. S. Rep. No.

94-589 (1976) at 404. A creditor must provide "specific reasons for the adverse action taken"—a generic explanation will not do. § 1691(d)(3). Statements that the adverse action was based on the creditor's internal standards or policies . . . are insufficient." 12 C.F.R. § 202.9(b)(2). And Congress defined "adverse action" broadly, as any "denial or revocation of credit, a change in the terms of an existing credit arrangement, or a refusal to grant credit in substantially the amount or on substantially the terms requested." § 1691(d)(6).

Requiring creditors to explain, in detail, their reasons for denying, revoking, or changing an existing credit arrangement serves two purposes. First, it provides a "pervasive and valuable education benefit." S. Rep. No. 94-589 (1976) at 406. A consumer who "know[s]" the reasons behind a credit deficiency can take action to remedy the problem. *Id.* Second, in the case where a creditor "may have acted on misinformation or inadequate information," a detailed explanation provides the consumer with an opportunity to "rectify the mistake." *Id.* A creditor who "act[s] in reckless disregard" of these notice requirements is subject to punitive damages. *Fischl*, 708 F.3d at 148; *see* § 1691e(b).

ECOA also gives "the appropriate United States district court" the ability to grant "such equitable and declaratory relief as is necessary to enforce the requirements imposed," without reference to who seeks that relief. § 1691e(c).

18

### 2. Michigan's Statutory Prohibition on Conversion

Michigan law creates a specific statutory cause of action for conversion. Mich. Comp. Laws § 600.2919a. A person "damaged as a result" of "[a]nother person's stealing or embezzling property or converting property to [that] person's own use" may bring a distinct state-law claim to "recover 3 times the amount of actual damages sustained, plus costs and reasonable attorney fees." § 600.2919a(1). By its terms, a statutory claim for conversion exists "in addition to any other right or remedy the person may have at law or otherwise." § 600.2919a(2).

Section 600.2919a is a distinct statutory claim—not merely a restatement of the common-law tort of conversion. *Aroma Wines & Equip., Inc. v. Columbian Distr. Servs., Inc.*, 497 Mich. 337, 2015 WL 3772434 (Mich. June 17, 2015). When the Legislature amended the statute to its current form, it imposed an "additional statutory requirement" not found in most common-law conversion regimes—a requirement "that the conversion was to the other person's 'own use.'" *Id.* As a result, "someone alleging conversion to the defendant's 'own use'" under § 600.2919a(1)(a) "must show that the defendant employed the converted property for some purpose personal to the defendant's interests, even if that purpose is not the object's ordinarily intended purpose." *Id.*

The Michigan Supreme Court has "emphasize[d]" that, in passing § 600.2919a, the Michigan Legislature "intended" to create a "separate statutory

cause of action for conversion" designed to "work alongside the common law" but not be subsumed by it. *Id*. Section 600.2919a(1) creates "a nonexclusive statutory cause of action" that can be maintained "in addition to" other remedies, including common-law conversion. *Id.* And, when it wrote the law, the Legislature "used expansive language indicating an intent to provide the broadest possible application, and thus allow cumulative remedies." *Dep't of Agriculture v. Appletree Marketing, LLC*, 779 N.W. 2d 237, 242 (Mich. 2010).

## C.    Procedural Background

Ms. Tyson filed suit against Car Source, Rami Kamil, and Al Chami in the Eastern District of Michigan, alleging both federal and state-law claims.[86] For purposes of this appeal, the complaint, as amended, alleges that Car Source violated the ECOA, 15 U.S.C. § 1691 *et seq.*, by providing her with a false credit approval and then, after revoking her deal, failing to provide her with proper notice of the revocation;[87] and (2) that Car Source and its employees violated Michigan's statute prohibiting conversion, Mich. Comp. Laws § 600.2919a, by intentionally repossessing Ms. Tyson's car to extract more money from her.[88]

---

[86] Complaint, R. 1, Page ID #1-12.

[87] Complaint, R. 32, Page ID #280-281.

[88] Complaint, R. 32, Page ID #281-284.

After discovery, the parties both sought summary judgment.[89] Car Source sought summary judgment on every claim.[90] Ms. Tyson sought summary judgment on her claim that Car Source violated both of ECOA's notice provisions when it failed to properly act on her credit application within thirty days and when it failed to provide her with an adverse-action notice after it revoked and changed her credit terms.[91]

The district court granted Ms. Tyson's motion for summary judgment.[92] First, it held that Car Source qualified as a "creditor" under the ECOA.[93] Explaining that the statute defines "creditor" as "any person who regularly extends, renews, or continues credit . . . [or] regularly arranges for the extension, renewal, or continuation of credit,"[94] the district court observed that the "relevant inquiry" is "whether the dealership participates in the decision or makes the decision to

---

[89] *See* Motion for Summary Judgment, R. 33, Page ID #289; Motion for Partial Summary Judgment, R. 44, Page ID #588.

[90] Motion for Summary Judgment, R. 33, Page ID #292.

[91] Motion for Partial Summary Judgment, R. 44, Page ID #598-604. Ms. Tyson also sought summary judgment on her claim that Car Source violated several Michigan statutes, including the Michigan Vehicle Installment Sales Contract and the Michigan Credit Reform Act when it demanded an additional $1,500 from Ms. Tyson to keep the car and then kept her original $1,200 down payment. *Id.*, Page ID #604-08. The district court agreed that Car Source violated these laws—a ruling that Car Source does not appeal. Order Granting Plaintiff's Motion for Partial Summary Judgment, R. 55, Page ID #941-945.

[92] Order Granting Plaintiff's Motion for Partial Summary Judgment, R. 55, Page ID #932.

[93] *Id.*, Page ID #938-940.

[94] *Id.*, Page ID #935-936.

21

extend credit."[95] Here, because Car Source "controls every single element of the extension of credit, and may change the terms of the credit agreement at will," the court held that Car Source "is a creditor for the purposes of ECOA's notice requirements."[96]

The district court next concluded that Car Source had "flagrant[ly] violat[ed]" the statute.[97] Car Source "revoked an offer of credit after attempting to change the terms" of the existing deal—both acts that the ECOA defines as "adverse."[98] Yet Car Source "admit[ted] that it never issues adverse action notices" as required by § 1691(d)(2)(3) and that "it did not do so in this circumstance."[99] In the court's view, Car Source's "wholesale abdication of its obligations under ECOA" warranted punitive damages; the court imposed ECOA's maximum statutory award of $10,000, in addition to actual damages of $1,248.[100]

The court, however, rejected the injunction Ms. Tyson sought against Car Source, which would prohibit the dealer from "neglecting its duties under ECOA in the future." In reaching this conclusion, the court held that "ECOA only permits

---

[95] *Id.*, Page ID #939-940.

[96] *Id.*

[97] *Id.*, Page ID #941.

[98] *Id.*, Page ID #940.

[99] *Id.*

[100] *Id.*, Page ID #941.

injunctive relief in the case of a civil action brought by the Attorney General of the United States."[101]

Car Source's summary-judgment motion was "based in large part on" the theory that Ms. Tyson did not have "familiarity with the legal basis for her claims."[102] Because a "lay plaintiff[]" is not charged with full knowledge of the "legal theory of their cases," the district court "disregard[ed]" this argument—which meant denying Car Source's summary-judgment request on nearly all of the claims.[103]

The district court, however, agreed with Car Source that Michigan's economic-loss doctrine barred both Ms. Tyson's common law and statutory conversion claims.[104] It held that, "under Michigan law, the economic loss doctrine bars recovery for conversion when the underlying transaction is governed by a contract."[105] In reaching this conclusion, the district court noted that, at least as of early 2015, the Michigan Supreme Court had not decided whether Mich. Comp.

---

[101] *Id.*

[102] Order on Motion for Summary Judgment, R. 43, Page ID #575, 579.

[103] *Id.*, Page ID #578, 579. Car Source also sought summary judgment on Ms. Tyson's Truth in Lending Act claim. Motion for Summary Judgment, R. 33, Page ID #291. The district court rejected Car Source's contention that Ms. Tyson's TILA claim must be dismissed and allowed the claim to move forward. Order on Motion for Summary Judgment, R. 43, Page ID #579-83. Car Source does not appeal this decision.

[104] Order on Motion for Summary Judgment, R. 43, Page ID #583.

[105] *Id.*, Page ID #585.

Laws § 600.2919a(2)'s statement that the remedy for conversion "is in addition to any other right or remedy the person may have at law or otherwise . . . negate[d] the economic loss doctrine."[106] In the absence of any "controlling authority to the contrary," the district court held that the doctrine "applies to consumer transactions" and, for the first time in Michigan, extended the doctrine's reach to apply to a statutory conversion claim arising from "spot delivery case[s]."[107] This cross-appeal followed.

## SUMMARY OF ARGUMENT

**I.** The district court correctly held that Car Source violated ECOA's statutory notice requirements. Under ECOA, when a creditor "deni[es]" or "revo[kes]" credit or "change[s]" the "terms of an existing credit arrangement," the consumer is entitled to a "statement of reasons for such action." 15 U.S.C. §§ 1691(d)(6), (d)(2). Car Source does not dispute the elements of its ECOA violation, and for good reason: It offered Ms. Tyson a set of credit terms, then revoked her credit after attempting to change the terms of her existing arrangement, and failed to provide the required explanation because it "did not even know what the ECOA was." That is a violation of the statute.

In an effort to avoid the consequences of its violation, Car Source instead challenges the point of the law. It claims that ECOA was "never intended to

---

[106] Order on Motion for Reconsideration, R. 48, Page ID #761, n.2.

[107] *Id.*, Page ID #761.

eliminate" a creditor's legitimate right to revoke or alter terms of credit. Car Source Br. at 10. That argument misses the point. ECOA fully contemplates that creditors will revoke or alter credit; when that happens, though, ECOA requires that the consumer be told why. This is not a burdensome responsibility. Had Car Source googled "ECOA" and "notice," it would have seen that the government provides creditors with simple, easy-to-use forms that satisfy the statute's requirements. On remand, the court should issue an injunction under ECOA.

**II.** When a plaintiff brings a claim for conversion under Mich. Comp. Laws § 600.2919a(1)(a), the claim exists "in addition to any other right or remedy the person may have at law or otherwise." § 600.2919a(2). The district court held, however, that Michigan's *common-law* economic-loss doctrine bars this statutory claim for conversion where the case involves an "underlying contract." That is error. It is black-letter law that, "if there is a conflict between the common law and a statutory provision, the common law must yield." *Pulver v. Dundee Cement Co.*, 515 N.W.2d 728 (1994). Although the statutory language is clear that a claim for statutory conversion must categorically be allowed to proceed "in addition to" *any* other right or remedy (with no exception for cases involving contracts), when the district court reached its contrary conclusion it did not have the benefit of the Michigan Supreme Court's recent "emphasi[s]" that § 600.2919a(2) allows a statutory conversion claim to "work alongside" all other "available" remedies,

*Aroma Wines*, 497 Mich. 337, 2015 WL 3772434, at n.51. That decision confirms that the Michigan Legislature's express decision to enable statutory conversion claims to proceed "in addition to" any other right or remedy—contract claims included—leaves no room for common-law rules like the economic-loss doctrine to otherwise limit a plaintiff's claims.

## STANDARD OF REVIEW

Summary judgment is proper if "the evidence, taken in the light most favorable to the non-moving party, demonstrates that there are no genuine issues of material fact for trial and the moving party is entitled to judgment as a matter of law." *Orrand v. Scassa Asphalt, Inc.*, 794 F.3d 556, 560 (6th Cir. 2015). This Court reviews de novo the district court's "grant of summary judgment and resolution of legal questions," but "accepts the district court's factual findings unless clearly erroneous." *TransAmerica Assur. Corp. v. Settlement Capital Corp.*, 489 F.3d 256, 259 (6th Cir. 2007).

## ARGUMENT

### I.    The District Court Correctly Determined that Car Source Violated the Equal Credit Opportunity Act.

When a creditor "take[s]" an "adverse action" against an applicant through a "denial or revocation of credit," or "a change in the terms of an existing credit arrangement," it violates ECOA if it fails to provide the applicant with "a statement of reasons for such action." 15 U.S.C. §§ 1691(d)(6), (d)(2). In this appeal,

Car Source disputes none of the core elements that establish liability under ECOA. It assumes "*arguendo*" that is "was a creditor under the ECOA" but offers no explanation why that assumption is incorrect. Car Source Br. at 10. It agrees that it took adverse action against Ms. Tyson, explaining that its decision to revoke the original terms of credit was a "rational decision" based on Ms. Tyson's "creditworthiness." Car Source Br. at 10. And it freely admits that it sent no notice explaining the reasons for its revocation because it "did not even know what the ECOA was." Car Source Br. at 22.

**A.** It would, in fact, be hard to find a more straightforward example of an ECOA notice violation. *First*, there is no doubt that Car Source is a creditor under ECOA. Car dealerships fall along a "continuum of participation in a credit decision"—from "no participation," to "referring applicants to the decision maker," to "final decision making." *Treadway v. Gateway Chevrolet Oldsmobile Inc.*, 362 F.3d 971, 980 (7th Cir. 2004). For ECOA's notice requirements, car dealers who "restructure[] the terms of the sale in order to meet the concerns of the creditor," "insist[] on more money down," and "set the annual [APR] associated with the sale" fall on the "'creditor side" of the continuum. *Id.* Car Source does all of this, and more. It "sets every material term" of its financing agreements: the "interest

rate or APR," the "down payment owed," and the "monthly payment owed."[108] It also "routinely restructures deals" when faced with a lender's decision not to fund an original set of terms.[109] The district court had little difficulty concluding that, given this conduct, "Car Source is a creditor for the purposes of ECOA's notice requirements."[110]

*Second*, Car Source's decision to revoke Ms. Tyson's original terms of credit qualifies as an adverse action under ECOA. A lender "revokes credit when it annuls, repeals, rescinds or cancels a right to defer payment of a debt." *Schlegel v. Wells Fargo Bank, N.A.*, 720 F.3d 1204, 1211 (9th Cir. 2013). Car Source's conduct here easily satisfies this definition. Once Car Source learned that Credit Acceptance would not "fund the deal,"[111] it cancelled the original terms of credit and "told [Ms. Tyson] to come in and sign a new contract."[112] That course of action—"[o]n its face"— revoked "the prior credit arrangement." *Schlegel*, 720 F.3d at 1211.

---

[108] Order Granting Plaintiff's Motion for Partial Summary Judgment, R. 55, Page ID #938; Deposition of Jon Lun, R. 44-12, Page ID #733.

[109] Order Granting Plaintiff's Motion for Partial Summary Judgment, R. 55, Page ID #938; Deposition of Jon Lun, R. 44-12, Page ID #733.

[110] Order Granting Plaintiff's Motion for Partial Summary Judgment, R. 55, Page ID # 940.

[111] Deposition of Rami Kamil, R. 44-2, Page ID  #652

[112] Deposition of Jon Lun, R. 41-10, Page ID #512; Deposition of Rami Kamil, R. 44-2, Page ID  #680; Deposition of Jon Lun, R. 41-10, Page ID #501.

*Third*, Car Source failed to satisfy ECOA's adverse-action notice requirement. When asked whether it *ever* "send[s] a notice to somebody telling them they've been denied credit and telling them why," Car Source answered "No."[113] And, in its brief here, Car Source concedes that it "did not even know what the ECOA was" and "did not understand the Act." Car Source Br. at 22.

ECOA's notice requirements "are not particularly arduous." *Treadway*, 362 F.3d at 975 n.2. They require only that a creditor inform the consumer of the "specific reasons for the adverse action taken," or at least disclose the availability of the explanation. § 1691(d)(3), d(2). The government has even provided several sample notification forms that are easily modified and can be used by any number of different creditors. *See* 12 C.F.R. § 202, App. C. One of them contains a simple checklist of reasons for the adverse action, including the very reason for which Car Source contends it revoked Ms. Tyson's credit: "Income insufficient for amount of credit requested." *Id.* (Form C-1). To comply with ECOA, all Car Source needed to do was download the form, print out a copy, enter Ms. Tyson's identifying information, and check the relevant box. It did none of this.[114]

---

[113] Deposition of Rami Kamil, R. 44-2, Page ID #698.

[114] Given this complete disregard of the law's requirements, the district court was right to conclude that Car Source should be subject to the statute's maximum punitive-damages award. Order Granting Plaintiff's Motion for Partial Summary Judgment, R. 55, Page ID #941. Car Source's only basis for challenging this decision is that the court "made no analysis for this award." Car Source Br. at 22. That is wrong. Under ECOA, to determine if punitive damages are warranted, a

**B.** Instead of tackling the district court's straightforward ECOA analysis head on, Car Source opts for an alternative theory for reversal: Relying on ECOA-discrimination cases, Car Source contends that imposing liability for "rational" decisions to revoke credit based on an applicant's "creditworthiness" would "step beyond the reasonable boundaries" of the law. Car Source Br. at 10, 11. In Car Source's view, ECOA was "never intended to eliminate" a creditor's legitimate right to revoke or alter terms of credit. Car Source Br. at 10 (citing *Lewis v. ACB Business Servs., Inc.*, 135 F.3d 389, 406 (6th Cir. 1998)). That misses the point.

ECOA's notice requirements nowhere "eliminate" a creditor's right to make rational decisions about an applicant's creditworthiness. Quite the opposite: The notice requirements specifically contemplate that a creditor may take "adverse action" against an applicant by "den[ying]" or "revo[king]" credit or "chang[ing]" the "terms of an existing credit arrangement." § 1691(d)(6). But if a creditor takes that action—rational or not—it must provide a "statement of reasons" explaining why, or simply making these reasons available for 60 days following the action. § 1691(d)(2). In Car Source's case, even if (counterfactually) it revoked the original

court may consider "among other relevant factors," the "frequency and persistence of failures of compliance by the creditor," and "the extent to which the creditor's failure of compliance was intentional." § 1691e(b). That is just what the district court did here when it "impose[d]" punitive damages "both because of Car Source's flagrant violation of ECOA's notice requirements and because of Car Source's wholesale abdication of its obligations under ECOA." Order Granting Plaintiff's Motion for Partial Summary Judgment, R. 55, Page ID #941.

terms of credit because Ms. Tyson "was not qualified for the credit she requested," Car Source Br. at 11, it still needed to explain that decision to her. That way, she could have learned whether Car Source "may have acted on misinformation or inadequate information," and taken steps to "rectify the mistake." *Fischl* 708 F.2d at 146 (quoting S. Rep. No. 94-589 (1976) at 406). Any other interpretation of the statute "would run contrary to the purpose of the strict notice requirement." *Treadway*, 362 F.3d at 977.[115]

Car Source also throws up a fact-specific objection to justify its "wholesale abdication" of ECOA's notice requirements.[116] It repeatedly claims Ms. Tyson "l[ied] about her monthly income" and "therefore the ECOA simply does not apply." Car Source Br. at 11. Car Source made this same assertion below, arguing that the district court should determine "whether Ms. Tyson signed a completed application on which she lied about her income."[117] But the issue is "not germane

---

[115] Car Source also suggests that ECOA's notice requirements are triggered only after a credit applicant "initially prove[s] that she was qualified for the credit, and that despite her qualification for the credit she was turned down." Car Source Br. at 11. But that rule applies only for ECOA-based *discrimination* claims, as *Mays v. Buckeye Rural Elec. Co-op, Inc.*—Car Source's only case—makes clear. 277 F.3d 873, 877 (6th Cir. 2002) (explaining that, because "ECOA and Title VII" have "similar purposes," the "burden-allocation system of federal employment discrimination law provides an analytical framework for claims of credit discrimination").

[116] Order Granting Plaintiff's Motion for Partial Summary Judgment, R. 55, Page ID #941.

[117] Order Denying Motion for Reconsideration, R. 58, Page ID #973.

to any of the claims" and, in any event, is waived.[118] As the district court explained,

Car Source "made no argument and presented no admissible evidence, either in its

response . . . or in its motion for reconsideration," that Ms. Tyson "lied about her

income."[119] Issues "unaccompanied by some effort at developed argumentation are

deemed waived." *United States v. Stewart*, 628 F.3d 246, 256 (6th Cir. 2010).[120]

In any event, the record demonstrates that Ms. Tyson did not lie about her

income. When she visited Car Source, she brought "copies of her two most recent

pay stubs" and copies of her most recent "bank statements from Bank of

America,"[121]—a fact Car Source itself confirmed.[122] Ms. Tyson's paystubs clearly

---

[118] *Id.*

[119] *Id.*

[120] Car Source also recycles (without developed argument) its claim that the district court made an adverse "credibility" determination of Mr. Kamil's testimony. *Compare* Car Source Br. at 23 (claiming that the district court "decided that the Affidavit of Rami Kamil was less credible than the deposition testimony of CAC's designated deponent") *with* Defendant's Motion for Reconsideration, R. 57, Page ID #954 ("Your Honor dismissed the Affidavit of Rami Kamil and trumped it with the deposition testimony of Credit Acceptance"). That is wrong. As the district court carefully explained, it made no "credibility determination," but instead, "reviewed the evidence before it, and found specific deposition testimony" that "clearly stated what defendant's role in credit transactions was." Order Denying Motion for Reconsideration, R. 58, Page ID #972. And nothing in Mr. Kamil's testimony "contradict[s] any of the specific factual assertions contained in the" record. *Id.* To the contrary, Mr. Kamil explained only that Car Source "never finances automobiles." Defendants' Proposed Late Response, R. 50-1, Page ID #841. Who "finances" the cars, though, says nothing about who controls the credit terms. Order Granting Plaintiff's Motion for Partial Summary Judgment, R. 55, Page ID #939, n.1.

[121] Declaration of SeTara Tyson, R. 41-2, Page ID #419

32

showed that she grossed "about $1,000 per month."[123] And the credit processing system Car Source used to process her deal required Car Source to "fill in all the information off of the pay stub" to calculate her terms.[124] When Car Source passed its contract on to Credit Acceptance, it also included "Ms. Tyson's pay stubs to prove her income" and it does not dispute the accuracy of this information.[125] Ultimately, as Credit Acceptance itself explained, any discrepancy between Ms. Tyson's documentation of her income and Car Source's own is because Car Source either "chose the wrong way" to complete the credit application or "entered [the information] incorrectly."[126]

All told, Car Source's main gripe is that it should be excused from its obligations under federal law because (in its view) it made a "rational" decision to cancel its deal with Ms. Tyson and demanded she enter into a new one. Even if true, though, that complaint is misplaced. ECOA's notice requirements don't superintend a creditor's decision to revoke or cancel a consumer's credit agreement; they require only that, if the creditor decides to take such action, the consumer must be told why. The district court correctly determined that Car

---

[122] *See* Deposition of Rami Kamil, R. 44-2, Page ID #640.

[123] Declaration of SeTara Tyson, R. 41-2, Page ID #419.

[124] Deposition of Jon Lun, R. 41-10, Page ID #505.

[125] *Id.*, Page ID #504.

[126] *Id.*, Page ID #510.

Source violated its obligations under the law.

The district court was right to hold that Car Source violated ECOA but erred in denying injunctive relief. The court's reasoning was that "ECOA only permits injunctive relief in the case of a civil action brought by the Attorney General of the United States" (quoting 12 C.F.R. § 1002.16(b)(4)).[127] But 12 C.F.R. § 1002.16(b)(4) states only that "the Attorney General may bring a civil action for such relief as may be appropriate, including … injunctive relief"—not that *only* the Attorney General may seek that relief. And § 1691e(c) gives "the appropriate United States district court" the ability to grant "such equitable and declaratory relief as is necessary to enforce the requirements imposed," without reference to who seeks that relief. Courts have thus correctly concluded that private "parties aggrieved by a creditor's noncompliance" with ECOA's notification requirements are "entitled to injunctive relief," *Bayard v. Behlmann Auto Servs.*, 292 F. Supp. 2d 1181, 1188 (E.D. Mo. 2003); *see also Ramirez v. Greenpoint Mortg. Funding, Inc.*, 268 F.R.D. 627, 637 (N.D. Cal. 2010). The court should therefore reverse, and remand with instructions to issue an appropriate injunction.

---

[127]Order Granting Plaintiff's Motion for Partial Summary Judgment, R. 55, Page ID #941.

## II.    Michigan's Economic-Loss Doctrine Does Not Bar Ms. Tyson's Statutory Conversion Claim.

Michigan law authorizes a person "damaged as a result" of "[a]nother person's stealing or embezzling property or converting property to [that] person's own use" to bring a statutory claim to "recover 3 times the amount of actual damages sustained, plus costs and reasonable attorney fees." Mich. Comp. Laws § 600.2919a(1). When a plaintiff brings such a statutory claim for conversion, the claim exists "in addition to any other right or remedy the person may have at law or otherwise." § 600.2919a(2). Without the benefit of the Michigan Supreme Court's recent "emphasi[s]" that § 600.2919a(2) allows a statutory conversion claim to "work alongside" all other "available" remedies, *Aroma Wines*, 497 Mich. 337, 2015 WL 3772434, at n.51, the district court held that, under Michigan's economic-loss doctrine, a statutory claim for conversion may not be maintained where "the underlying transaction is governed by a contract."[128] That conclusion is reversible error. The Michigan Legislature's express decision to enable statutory conversion claims to proceed "in addition to" *any* other right or remedy—contract claims included—leaves no room for common-law rules like the economic-loss doctrine.

---

[128] Order on Motion for Summary Judgment, R. 43, Page ID #585.

### A.    Section 600.2919a(2) unambiguously permits statutory conversion claims to proceed alongside *all* other claims.

The district court's decision to bar Ms. Tyson's statutory conversion claim because her complaint included an "underlying contract claim,"[129] cannot be reconciled with the text of § 600.2919a(2). Section 600.2919a(2) contemplates that a statutory claim for conversion can proceed "in addition to *any other right or remedy . . . at law or otherwise.*" § 600.2919a(2) (emphasis added). The provision draws no exception for cases involving other claims arising from an "underlying contract." Instead, it uses "expansive language" to "provide the broadest possible application" and categorically authorizes statutory conversion claims to move forward regardless of any other claims in the case. *Dep't of Agriculture v. Appletree Marketing, LLC*, 779 N.W. 2d 237, 242 (Mich. 2010).

The Michigan Supreme Court made this point in *Appletree*: It held that the "specific language used in the statutory conversion provision M.C.L. 600.2919a(2) provides that relief for a claim of statutory conversion" is "clear, unambiguous," and "explicitly indicates the cumulative nature of statutory conversion claims." 779 N.W. 2d 237, 242 (Mich. 2010). Parsing this language, *Appletree* explained that, because "[a]ny" means "every; all," the phrase "in addition to any other remedy provided by law" simply "does not limit the remedies [a plaintiff] may pursue." *Id.* at 242.

---

[129] Order on Motion for Reconsideration, R. 48, Page ID #764-765.

The district court found *Appletree* unpersuasive because (in its view) the case focused only on "whether different statutory remedies conflict"—not on "whether the economic loss doctrine bars a tort claim."[130] But confining *Appletree*'s interpretation of § 600.2919a(2) only to cases of statutory conflict does considerable violence to the statute's straightforward command. Section 600.2919a(2), without exception, "does not limit the remedies [a plaintiff] may pursue." *Appletree*, 779 N.W. 2d at 242.

## B. Section 600.2919a overrides the common-law economic-loss doctrine.

A court presented with § 600.2919a(2)'s clear statutory command must do just what the statute says: It must allow the statutory conversion claim to proceed alongside any other right or remedy advanced in the case. After all, "[i]f the Legislature has clearly expressed its intent in the language of a statute, that statute must be enforced as written, free of any 'contrary judicial gloss.'" *Appletree*, 779 N.W. 2d at 241. Any contrary rule—common law or otherwise—that "cannot be applied in a manner" consistent "with the plain language prescribed by the Legislature" must yield. *Appletree*, 779 N.W. 2d at 241 (refusing to apply rule of statutory construction where it would "displace[] the plain reading" of a statute).

Without the benefit of *Aroma Wines*, the district court lost sight of this principle. It applied the common-law economic-loss doctrine to bar Ms. Tyson's

---

[130] Order on Motion for Reconsideration, R. 48, Page ID #758.

statutory conversion claim because it could find no "controlling authority" that "negated" the doctrine.[131] But the "controlling authority" here is the statute itself. Like most states, the Michigan Supreme Court has long held that "if there is a conflict between the common law and a statutory provision, the common law must yield." *Pulver v. Dundee Cement Co.*, 515 N.W.2d 728 (1994); *see In re Receivership*, 821 N.E. 2d 503, 513 (Mich. 2012) (holding that a "common law rule" may not apply where it would "irreconcilably conflict" with "the imperative of the plain statutory language"); *see also* Mich. Comp. Laws § 440.9626 cmt. 2 (explaining that, under UCC, a separate claim for conversion under non-UCC law is allowed "[i]n a proper case"); Mich. Comp. Laws § 440.9620 cmt. 12 (stating that "[r]emedies available under other law, including conversion, remain available under [the UCC] in appropriate cases").

The economic-loss doctrine is "root[ed] in" the "common law," *Cleveland Indians Baseball Co., L.P. v. New Hampshire Ins. Co.*, 727 F.3d 633, 640 (6th Cir. 2013), and is an exercise of the state high court's "power[] to shape the common law." Vincent A. Wellman, *Assessing the Economic Loss Doctrine in Michigan: Making Sense Out of the Development of Law*, 54 Wayne L. Rev. 791, 793 (2008). Broadly speaking, the doctrine "bars tort recovery and limits remedies" to those available for breach of contract "where a claim for damages arises out of the commercial sale of goods and

---

[131] Order on Motion for Reconsideration, R. 48, Page ID #761.

losses incurred are purely economic." *Neibarger v. Universal Cooperatives, Inc.*, 486 N.W. 2d 612, 613 (Mich. 1992). It is, by and large, designed to act as a limitation "on recovery of damages in negligence actions in the absence of physical harm to a person or property." *Id.*

But because the doctrine is a common-law rule, it applies (if at all) *only* "[i]n the absence of legislative direction." *Neibarger*, 486 N.W. 2d at 618. As other courts have likewise explained, where the legislature has specifically enacted a statutory claim, the economic-loss doctrine is both "irrelevant to" and "inconsistent with" that "legislative choice." *Kailin v. Armstrong*, 643 N.W. 2d 132, 149 (Wis. App. 2002) (holding that "the economic loss doctrine does not apply" to statutory claims); *see also In re Saturn L-Series Timing Chain Prods. Liability Litig.*, 2008 WL 4866604, at *17 (D. Neb. Nov. 7, 2008) (explaining that the doctrine "has no application" to a claim "created wholly by statute"). Applying the doctrine here, to bar a statutory claim, would not only expand the doctrine's reach (in the absence of any clear statement from the Michigan Supreme Court), but it would eliminate the very remedy § 600.2919a(2) says may move forward. The doctrine must therefore yield.

### C.   The Michigan Supreme Court's intervening decision in *Aroma Wines* confirms that statutory conversion claims can coexist with breach-of-contract claims.

The district court concluded that the economic-loss doctrine bars a § 600.2919a claim for conversion where the parties' "transaction [is] otherwise

governed by an underlying contract"[132] because no guiding "case" had established that "this section of the statute negated the economic loss doctrine."[133] There is now a case. Four months after the district court's decision, the Michigan Supreme Court confirmed that, even in a case otherwise governed by an underlying contract, § 600.2919a "creat[es] a nonexclusive statutory cause of action" that "work[s] alongside the common law" and can proceed "in addition to other remedies available." *See Aroma Wines*, 497 Mich. 337, 2015 WL 3772434, at n.51. The district court did not have the benefit of *Aroma Wines*, but it reinforces our point: Under Michigan law, a statutory claim for conversion may proceed even in the face of an "underlying contract."[134]

In *Aroma Wines*, a wholesale wine importer (Aroma) "agreed to rent . . . climate-controlled warehouse space" in Michigan from Columbian Distribution Services so it could store its wine "while awaiting sale." *Aroma Wines*, 497 Mich. 337, 2015 WL 3772434. The parties' transaction was governed by an underlying contract. "According to the parties' agreement," Columbian was "required" to maintain the wine within a specific temperature range. *Id.* The agreement also required Columbian to "provide Aroma with notice" before it could transport the

---

[132] Order on Motion for Reconsideration, R. 48, Page ID #758.

[133] *Id.*, Page ID #761, n.1.

[134] Order on Motion for Reconsideration, R. 48, Page ID #758.

wine to a different warehouse complex, but Columbian reserved the right "under the agreement" to move the wine "without notice" within the warehouse complex itself. *Id*. For several years, the arrangement worked well. But in 2008 Aroma's sales plummeted and it fell behind on its rental payments; by early 2009, Aroma owed Columbian more than $20,000. *Id*.

At "some point during this dispute"—and "contrary to the terms of the contract"—Columbian took Aroma's wine from its climate-controlled space and moved it to an "uncontrolled environment." *Id*. That move, according to Aroma, "destroyed the wine's salability." *Id*. So Aroma brought suit, alleging "four separate causes of action"—including a "breach of contract" claim and one for "statutory conversion under MCL 600.2919a(1)(a)." *Id*. For its statutory conversion claim, Aroma sought "treble damages for the alleged conversion." *Id*.

The Michigan Supreme Court confirmed that this claim could proceed "alongside" all others—breach-of-contract or otherwise—even if that meant awarding the plaintiff extra-contractual damages. *Id*. at n.51. "By enacting MCL 600.2919a," the court explained, the Legislature "intended to create a separate statutory cause of action for conversion 'in addition to any other right or remedy.'" *Id*. For claims proving a violation of § 600.2919a, a defendant could be liable for more than simply the damages under a contract.

The court did not interpret § 600.2919a, however, as opening the door to extra-contractual damages for every conceivable conversion claim. To the contrary, the "separate" statutory conversion claim "is not the same as common-law conversion" because it adds an additional element: a "showing that the defendant employed the converted property for some purpose personal to the defendant's interests." *Id.* That elevated requirement means that allowing a statutory claim for conversion to proceed would not permit a "plaintiff to recover treble damages in all instances of common-law conversion." *Id.*

\*        \*        \*

Taken together, the plain meaning of § 600.2919a, the Michigan Supreme Court's recent interpretation of the statute, and the requirement that the common law yield in the face of clear statutory language point uniformly in one direction: Ms. Tyson's claim for statutory conversion should have been allowed to proceed. The district court's decision holding that the common-law economic-loss doctrine bars her statutory claim must therefore be reversed.

## CONCLUSION

The district court's grant of summary judgment in favor of Ms. Tyson should be affirmed. But its refusal to grant injunctive relief under ECOA and its dismissal of Ms. Tyson's statutory conversion claim should be reversed, and the case remanded for further proceedings.

Respectfully submitted,

/s/ Deepak Gupta
Deepak Gupta
Matthew W.H. Wessler
Richard J. Rubin
GUPTA WESSLER PLLC
1735 20th Street, NW
Washington, DC 20009
(202) 888-1741

Ian Lyngklip
LYNGKLIP & ASSOCIATES
24500 Northwestern Hwy, Suite 206
Southfield, MI 48075
(248) 208-8864

*Counsel for the Appellants/Cross-Appellees*

September 18, 2015

## STATEMENT IN SUPPORT OF ORAL ARGUMENT

Plaintiff SeTara Tyson respectfully requests oral argument. This case arises from an egregious instance of a "spot delivery" or "yo-yo" scam by a used-car dealer. In the decision below, the federal district court decided a significant question of Michigan law: Does the state's common-law economic-loss doctrine bar a statutory claim for conversion? The court concluded that the common-law rule *does* bar statutory claims, but it lacked the benefit of an intervening Michigan Supreme Court decision emphasizing that statutory conversion claims "work alongside" all other "available" remedies. *Aroma Wines*, 2015 WL 3772434. Oral argument is warranted because the district court's decision is both unprecedented and in conflict with the Michigan Supreme Court's decision.

## CERTIFICATE OF COMPLIANCE

This brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) because this brief contains 9,889 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii). This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because this brief has been prepared in proportionally spaced typeface using Microsoft Word 2010 in 14 point Baskerville font.

/s/ Deepak Gupta
Deepak Gupta
*Counsel for Appellants*

September 18, 2015

**DESIGNATION OF RELEVANT DISTRICT COURT DOCUMENTS**

| Record # | Brief Description | Page ID Range |
|---|---|---|
| 1 | Complaint | 1-12 |
| 32 | Complaint | 275-284 |
| 33 | Motion for Summary Judgment | 289-292 |
| 33-3 | Deposition of SeTara Tyson | 331-338 |
| 33-4 | Letter to SeTara Tyson | 341 |
| 41-2 | Declaration of SeTara Tyson | 419-421 |
| 41-3 | Declaration of Leslie Tyson | 424 |
| 41-7 | Deposition of SeTara Tyson | 439-463 |
| 41-9 | Retail-Installment Contract | 493-494 |
| 41-10 | Deposition of Jon Lun | 501-512 |
| 41-12 | Car Source Sign | 534 |
| 41-13 | Letter from Deputy Commissioner of Michigan Financial Institutions' Bureau Murray Brown | 535 |
| 41-17 | Bulletin of State of Michigan Department of Insurance and Financial Services | 563 |
| 41-18 | Dealer Advisory | 565 |
| 43 | Order on Motion for Summary Judgment | 575-587 |
| 44 | Motion for Partial Summary Judgment | 588-608 |
| 44-2 | Deposition of Rami Kamil | 624-698 |
| 44-3 | Credit Application | 714 |
| 44-12 | Deposition of Jon Lun | 733 |
| 48 | Order on Motion for Reconsideration | 758-767 |
| 50-1 | Defendants' Proposed Late Response | 841 |

| | | |
|---|---|---|
| 55 | Order Granting Plaintiff's Motion for Partial Summary Judgment | 932-945 |
| 57 | Defendant's Motion for Reconsideration | 954 |
| 58 | Order Denying Motion for Reconsideration | 972-973 |
| 59 | Stipulation and Order | 975-976 |
| 60 | Notice of Appeal | 977 |
| 62 | Notice of Cross Appeal | 980 |

## CERTIFICATE OF SERVICE

I certify that, on September 18, 2015, the foregoing brief was served on all parties or their counsel of record through the CM/ECF system.

*/s/ Deepak Gupta*
Deepak Gupta